# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 4:22-CR-162 |
| | § | Judge Mazzant |
| HADI AKKAD (2) | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Hadi Akkad's Emergency Motion for Release of Funds Needed to Pay Legal Fees and Expenses and Request for Expedited Decision (Dkt. #415). Having considered the Motion, the relevant pleadings, and the applicable law, the Court finds that the Motion should be **DENIED** without prejudice. Also pending before the Court is Defendant Akkad's Motion for Leave to File Response to Government "Surreply" to Emergency Motion for Release of Funds to Pay Legal Costs and Fees (Dkt. #425). The Court finds that the Motion for Leave should be **GRANTED**.

### BACKGROUND

On July 14, 2022, a Grand Jury indicted Hadi Akkad with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) by engaging in transactions in excess of $10,000 with the proceeds of wire fraud (Dkt. #1). The Indictment based its charges against Akkad for his role as the Executive Vice President of Electronic Transactions Systems Corporation ("ETS") between the years of 2012 through 2019 (Dkt. #1). On March 5, 2023, a Grand Jury returned the First Superseding Indictment, which expanded the years of the conspiracy from 2012 through the summer of 2023 and charged Akkad engaging in a conspiracy to commit money laundering by

concealment (Dkt. #274). According to the First Superseding Indictment, ETS was a credit and debit card processing company, which exploited its position as a middleman in communicating payment card transaction information to charge its customers undisclosed markups (Dkt. #274 at ¶ 4).[1] On all payment card transactions, ETS charged a pass-through fee set by the card brand associations (e.g., Visa, Mastercard, American Express, etc.) as well as a small percentage fee that ETS would retain (Dkt. #274 at ¶¶ 6–7). ETS also charged an additional 0.3% markup for all debit card transactions, which it embedded into the interchange fee section—the fees ETS told its customers that it solely passed on to the card brand associations (*See* Dkt. #274 at ¶¶ 8–10). Because of the hidden-fee scheme, ETS was valued at approximately $170 million and sold its assets to Elavon, Inc. and U.S. Bank National Association (collectively the "Bank") as part of an acquisition (Dkt. #229 at p. 1; Dkt. #274 at ¶ 24). As a result of the acquisition, Edward Vaughan (ETS's president and CEO) received approximately $107 million, and Akkad received approximately $33 million (Dkt. #274 at ¶ 24).

In addition to Vaughan and Akkad, the Grand Jury indicted four other defendants in the First Superseding Indictment—Jill Hall Mandichak (ETS's National Sales Manager), Sean Lynch (ETS's Sales Manager), Katherine Nguyen (ETS's Director of National Accounts), and Gina Ellingsen (ETS's Payments Industry Expert) (Dkt. #274 at ¶ 3). Mandichak, Lynch, and Nguyen pleaded guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 on December 15, 2022 (*See* Dkt. #123, Dkt. #128, Dkt. #133). About a month after they pleaded guilty, Akkad

---

[1] A payment card transaction is a three-party transaction. First, a merchant will engage a card process company (like ETS) to provide the hardware and software to read credit and debit cards. When a customer pays the merchant using the card, the card processing company will handle the communication of the transaction to the bank where the client has funds. In exchange for the necessary equipment and communications, the card processing company will charge a set amount of fees for its own services. Additionally, the card processing company will charge a fee associated with the card brand used, which it then passes on to the card brand.

transferred over $12 million to a bank account in his wife's name, which violated his bond conditions that required him to receive Court permission to engage in monetary transactions in excess of $10,000 (Dkt. #274 at ¶ 28; Dkt. #405 at p. 15).Vaughan, Akkad, and Ellingsen proceeded to a jury trial, which began on April 1, 2025 (*See* Dkt. #351).

At trial, the Government introduced a significant amount of evidence and testimony outlining the allegedly fraudulent scheme, Akkad's role in the conspiracy, and Akkad's various financial transactions after he received the $33 million from the sale of ETS. After the Government rested, Vaughan, Akkad, and Ellingsen moved for a directed verdict of acquittal (Dkt. #373). The Court denied Vaughan and Akkad's Motions for Acquittal (Dkt. #388). However, the Court granted Ellingsen's Motion and entered a Judgment of Acquittal as to her (Dkt. #402; Dkt. #413). After deliberating, the jury returned a partial verdict acquitting Akkad of Count 2 conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Dkt. #411). The Court declared a mistrial as to Counts 1 and 2 against Vaughan and Count 1 against Akkad because the jury was deadlocked as to those Counts (Dkt. #404). After declaring a mistrial, the Court set the case for retrial on May 12, 2025 (Dkt. #412).

On April 23, 2025, Akkad filed an Emergency Motion for Release of Funds Needed to Pay Legal Fees and Expenses and Request for Expedited Decision (Dkt. #415). In that Motion, Akkad seeks the release of $2.25 million from the $12.9 million the Government seized from the account in his wife's name to pay for attorneys' fees and expenses for the retrial (Dkt. #415). On April 30, 2025, Akkad filed a Notice that he was decreasing his request to approximately $2 million (Dkt. #420). That same day, the Government filed a Response opposing the release of any funds from the seized amount (Dkt. #421). On May 2, 2025, Akkad filed his Reply (Dkt. #423). The

Government filed a Sur-Reply the same day (Dkt. #424). On May 3, 2025, Akkad filed a Motion for Leave to File Response to Government "Surreply" to Emergency Motion for Release of Funds to Pay Legal Costs and Fees (Dkt. #425).

## LEGAL STANDARD

"[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). The right of a defendant to a fair opportunity to secure counsel of choice is a fundamental right. *Powell v. Alabama*, 287 U.S. 45, 53 (1932). However, the "fair opportunity" is not without limits, as a defendant has no right to an attorney who is not a member of the bar or who has a conflict of interest due to a relationship with an opposing party. *Luis v. United States*, 578 U.S. 5, 11–12 (2016) (plurality opinion) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)). Further, an indigent defendant is entitled to adequate representation but has no right to force the Government to pay for his preferred choice of counsel. *See Caplin & Drysdale*, 491 U.S. at 624.

Not all property can be used to pay for a lawyer, as 21 U.S.C. § 853 authorizes a court to freeze an indicted defendant's assets prior to trial if those assets would be subject to forfeiture upon conviction. *Kaley v. United States*, 571 U.S. 320, 322 (2014). In order to freeze an indicted defendant's assets pretrial, the restraint of the funds must be "based on a finding of probable cause to believe that the property will ultimately be proved forfeitable." *United States v. Monsanto*, 491 U.S. 600, 615 (1989). The probable cause standard applies even when a defendant seeks to use the disputed property to pay for a lawyer. *Kaley*, 571 U.S. at 322. The Government has a strong interest in obtaining a full recovery of all forfeitable assets. *Id.* at 323 (citing *Caplin & Drysdale*, 491 U.S. at

4

631). Thus, in order to effectuate that interest, the Government must have probable cause to think that (1) the defendant committed an offense permitting forfeiture, and (2) the property at issue has the requisite connection to that crime. *Id.* (citing 21 U.S.C. § 853(a)).

When determining the propriety of a pretrial freeze of a defendant's assets, a distinction must be made between tainted and untainted funds. *See Luis*, 578 U.S. at 10. The pretrial freeze of tainted funds (i.e., those traceable to the crime) is constitutionally permitted, even if it prohibits the defendant from paying for his counsel of choice. *Monsanto*, 491 U.S. at 614–16. However, the pretrial freeze of untainted funds (i.e., those with no relation to the crime) violates a defendant's Sixth Amendment right to counsel. *Luis*, 578 U.S. at 22–23. To determine whether funds are tainted, the Court must look at the ownership of the funds. *Id.* at 12. The question is simply whether the defendant owns the property "pure and simple." *Id.* at 12. For example, a robber's loot belongs to the victim, not the defendant. *Id.* at 13 (citing *Telegraph Co. v. Davenport*, 97 U.S. 369, 372 (1878)). Likewise, cocaine is contraband, considered forfeitable to the Government wherever found. *Id.* (citing 21 U.S.C. § 881(a)). Further, title to property used to commit a crime (or otherwise "traceable" to a crime) often passes to the Government at the instant the crime is planned or committed. *Id.* (citing 21 U.S.C. § 853(c)). In contrast, cash owned by the defendant prior to the planning or commission of the crime is owned by the defendant, free and clear of any interest by the Government or a victim. *See id.* at 17.

To determine what property is forfeitable, the Court must look at 18 U.S.C. § 981, which authorizes the pretrial restraint and forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation" of conspiracy to commit wire

5

fraud. 18 U.S.C. § 981(a)(1)(C). The statute defines proceeds in two different ways, depending on the nature of the criminal offense:

> (A) In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.
>
> (B) In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. The claimant shall have the burden of proof with respect to the issue of direct costs. The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.

18 U.S.C. § 981(a)(2)(A)–(B). In the Fifth Circuit, the definition in subsection (A) applies to those services which could never be performed legally (e.g., sale of food stamps, robbery, embezzlement). *United States v. Davis*, 53 F.4th 833, 853 (5th Cir. 2022). In contrast, the definition in subsection (B) applies when the services in the case were performed illegally but hypothetically could be performed legally. *Id.* (citing *United States v. Nacchio*, 573 F.3d 1062, 1089 (10th Cir. 2009)) ("[The] crime therefore involved a 'service that could, hypothetically, be provided in a lawful manner' (HVAC training) but that was provided in an 'illegal manner' (by fraudulently obtaining GI-Bill funds to pay students' tuition)").

Notably, wire fraud is not an unlawful activity that would fall under the definition in subsection (A). *Id.* at 853–54. Instead, it constitutes an activity that could hypothetically be lawful, thus entitling the proceeds of wire fraud to the definition under subsection (B). *Id.* For proceeds as defined under subsection (B), the defendant bears the burden to show the amount of direct costs that are not subject to forfeiture. *Id.* at 854; 18 U.S.C. § 981(a)(2)(B). Direct costs are those

6

incurred in providing the goods or services, excluding any income taxes or overhead expense to provide those goods and services. *Davis*, 53 F.4th at 854 (citing 18 U.S.C. § 981(a)(2)(B)).

## ANALYSIS

Akkad seeks the release of approximately $2 million in seized funds to pay for attorneys' fees for the retrial of this case because he is unable to pay any fees in his current financial position (Dkt. #415; Dkt. #420).[2] To support his request, Akkad relies on the Supreme Court's decision in *Luis v. United States* to argue that he has a Sixth Amendment right to use the funds he owns to pay for counsel of his choice (Dkt. #415). According to Akkad, the evidence at trial established that the value of ETS was inflated, which also established that ETS had legitimate value when it sold (Dkt. #415) Thus, he argues he is entitled to use the amount he received for the uninflated value of ETS to pay for his attorneys (Dkt. #415). He cites the Fifth Circuit's decision in *Davis* to make the distinction that the proceeds of fraud do not include the legitimate value of ETS (Dkt. #415). Finally, he cites to *United States v. Hartfield* from the Eastern District of New York to show that courts can look at the inflated value of stock as proceeds of fraud, while the base value of the stock is not included as proceeds (Dkt. #415 at p. 5) (citing No. 06-CR-0550 (JS), 2010 WL 1685826, *3–4 (E.D.N.Y. Apr. 21, 2010). As alternate relief, Akkad requests a hearing to establish probable cause that the funds in dispute are traceable or sufficiently related to the crime charged under *Kaley v. United States* (Dkt. #415 at p. 3 n.1).

The Government opposes the release of any seized funds (Dkt. #421). The Government's argument is fourfold. First, it argues that the entire $12 million are proceeds of fraud because

---

[2] Akkad originally requested approximately $2.25 million in his Motion, but he decreased that amount based on the ability to liquidate some assets in his children's investment accounts (Dkt. #415; Dkt. #420).

7

Elavon, Inc. and U.S. Bank National Association (collectively the "Bank") would not have purchased ETS but for the fraud (Dkt. #421 at pp. 5–7). Second, it argues that under 18 U.S.C. § 981(a)(2)(A), the funds are proceeds of an unlawful activity and the entire amount is subject to forfeiture (Dkt. #421 at pp. 7–8). As part of this point, the Government cites to a case from the Southern District of New York where a district court found that the entire amount of inflated stock was forfeitable rather than just the inflated portion (Dkt. #421 at p. 8) (citing *United States v. Milton*, No. 21-CR-00478 (ER), 2024 WL 779210, at *5 (S.D.N.Y. Feb. 26, 2024)). Third, the Government argues that, even assuming Akkad is correct that the § 981(a)(2)(B) definition of proceeds applies, Akkad has not proven that there are direct costs to deduct from funds that are "proceeds" of his fraud (Dkt. #421 at pp. 9–11). Finally, the Government argues that *Luis* is distinguishable because there the parties agreed that the funds at issue were untainted, while here the parties dispute whether the funds were tainted or untainted (Dkt. #421 at pp. 11–14). The Government also argues that a hearing on probable cause is unnecessary because the Magistrate Judge already decided that there was probable cause to seize the account (Dkt. #421 at p. 14 n.4). Further, the Government notes that the first trial provided ample evidence to establish probable cause (Dkt. #421 at p. 14 n.4).

Akkad's Reply challenges the Government's arguments, positing that the Government entirely overlooks the legitimate value ETS had at the time it was sold to the Bank, and that Jamie Walker (the Bank's CEO) was not a credible witness who failed to answer any questions posed by the defense (Dkt. #423 at pp. 1–5). Akkad then returns to the arguments from his Motion that the portion of funds for the legitimate value of ETS are not proceeds of an illegal activity (Dkt. #423 at pp. 6–14). The Government's Sur-Reply focuses on the existence of probable cause as found by

8

the Magistrate Judge to seize the entire $12.9 million, as well as the existence of evidence during the first trial to support that finding (Dkt. #424) Further, the Government argues that Akkad lacks a concrete valuation that reflects the fair market value of ETS or any direct costs he could deduct from the funds (Dkt. #424). In response to the Sur-Reply, Akkad seeks leave to respond (Dkt. #425). As part of his response, Akkad argues that the affidavit supporting the seizure warrant acknowledges the same fact as the evidence at trial—that ETS had some legitimate value and some inflated value when it sold to the Bank (Dkt. #425–1).

### I. Leave to File Response to the Government's Sur-Reply

Before the Court turns to the substance of the Parties' arguments, it must first deal with Akkad's Motion for Leave to File a Response to the Government's Sur-Reply (Dkt. #425). Akkad argues that leave is appropriate so that he can respond to a new argument raised in the Government's Sur-Reply and to clarify two points for the Court (Dkt. #425). The Government has not filed or indicated that it opposes the leave. However, even assuming that the Government files opposition, the Court has discretion to manage its docket and give leave. Local Rule CR-47(b); *Edwards v. Cass Cty., Tex.*, 919 F.2d 273, 275 (5th Cir. 1990) ("The district court has broad discretion in controlling its own docket"). Accordingly, the Court grants Akkad's Motion for Leave to file a Response to the Government's Sur- Reply so that it can consider all issues fully.

### II. Probable Cause to Seize the Funds

Second, the Court will briefly address the probable cause issue. In order to restrain funds before a criminal trial, the Government must establish probable cause that (1) the defendant has committed an offense permitting forfeiture, and (2) the property at issue has the requisite connection to that crime. *Kaley*, 571 U.S. at 323–24 (citing 21 U.S.C. § 853(a)). In this case, the Government has clearly established the probable cause requirement, as reflected in the seizure

9

warrant authorized by the Magistrate Judge, the First Superseding Indictment, and the voluminous evidence introduced at the first trial (Dkt. #274; Dkt. #421-1). Thus, the Court finds that probable cause to restrain the $12.9 million is clearly established and a hearing on the issue is not warranted at this time. Thus, the only question remaining is whether Akkad is entitled to a release of any of the seized funds to pay his attorneys under the standard set out by the Supreme Court in *Luis*.

### III.    Akkad's Ownership of Untainted Funds

To determine if Akkad is entitled to the release of a portion of the seized funds, the Court must evaluate whether Akkad legally owned any portion of those funds, free and clear of any fraud that occurred. *See Luis*, 578 U.S. at 12. In other words, the question is whether Akkad owns at least $2 million of the $12.9 million seized by the Government, or whether the entire amount is tainted by Akkad's alleged involvement in the conspiracy alleged. *See id.* at 13-14. If the $12.9 million is all traceable to the conspiracy to commit wire fraud, it is tainted and the Government may properly restrain the funds until the conclusion of trial. *See Monsanto*, 491 U.S. at 615-16. Thus, if the property is tainted, it cannot be released to Akkad to pay his attorneys. *Id.* However, if the property is not tainted, the Court may release the requested amount. *See Luis*, 578 at 17. Ultimately, for the reasons discussed below, the Court finds that Akkad has failed to prove what amount of the $33 million from the sale of ETS is untainted, much less if any of the $12.9 million seized is untainted.

Akkad primarily relies on the Supreme Court's decision in *Luis* to argue that he is entitled to those funds from the sale of ETS that reflect its legitimate value (i.e., the inherent value ETS had without including the inflation due to the alleged conspiracy to commit wire fraud) (Dkt. #415). However, this case is different from *Luis* because the *Luis* parties agreed that the funds were untraceable to the criminal conduct and they were legally owned by the defendant. *Id.* In contrast, Here the $12.9 million seized by the Government is directly related to the alleged criminal conduct

that cause ETS to sell at an inflated price. In other words, while the disputed funds in *Luis* were unrelated to the criminal conduct, all parties in this case agree that the $12.9 million directly comes from the sale of ETS, which had an inflated value due to the conspiracy to commit wire fraud (Dkt. #415; Dkt. #422). Thus, *Luis* does not provide a 1:1 comparison in this case.

The disputed funds appear to be fully traceable to the alleged criminal conduct and subject to pretrial restraint. *Monsanto*, 491 U.S. at 614–16. Yet, the Court must distill the discussion further and look specifically at why Akkad claims some of the funds are untainted. Essentially, the funds at issue are payment for the sale of his ownership interest in ETS, as reflected by the stock that Akkad owned (*See* Dkt. #423; Dkt. #423-1). According to Akkad, the payment for his stock consisted of two parts: the inflated portion subject to pretrial restraint, and the portion reflecting the legitimate value of ETS which he owns outright (*See* Dkt. #415; Dkt. #423; Dkt. #425). Yet, Akkad has not shown the value of the untainted portion reflecting the legitimate value of ETS (*See* Dkt. #415; Dkt. #423; Dkt. #425). Thus, the current distinction is not helpful without specific evidence showing what portion of the $33 million was untainted.

However, it is clear that Akkad did own an undeniable portion of ETS which was not tainted by his alleged criminal conduct. Both the Government and Akkad overlook the fact that ETS was in existence for years preceding the alleged fraudulent conduct (*See* Government Trial Ex. #120). Thus, at the time the shares were issued to Akkad up to the point before ETS implemented the 0.3% charge on Debit transactions, Akkad had ownership of property that was not related to the fraud. While it is difficult to estimate the legitimate value and growth of ETS after the fraudulent scheme was implemented in 2012, the property that Akkad owned before the fraud is simply what he owned and accurately reflects the value of his clearly untainted property.

In other words, Akkad owned part of ETS prior to any fraud, and it is that property which he would be permitted to use to pay for his defense. It is undeniable that Akkad owned ETS shares prior to any illegal conduct alleged in the First Superseding Indictment. Thus, the Court finds that the restraint on those funds from being used to pay for defense attorneys would violate the rule set out in *Luis*. *See* 578 U.S. at 12–23. Akkad owned his shares in ETS prior to any alleged criminal conduct and the purchase of those shares at the market price before the fraudulent scheme was implemented would create an untainted asset he could use for his defense (Dkt. #423-1 at p. 129) (listing Akkad as an ETS shareholder); (Government Trial Ex. #120 at p. 34) (showing Akkad was added as ETS's Vice President in 2004). *See id.* Therefore, Akkad would likely be entitled to the release of funds in the amount of his ownership interest either at the time he was issued the shares by ETS or at any time before the time period of misconduct as alleged in the First Superseding Indictment. *See Luis*, 578 U.S. at 17; *see also Davis*, 53 F.4th at 853–54.

Fifth Circuit precedent also supports the Court's reasoning. In *Davis*, the Fifth Circuit evaluated the difference in proceeds under § 981(a)(2). 53 F.4th at 852–54. In doing so, it found that wire fraud is not an unlawful activity under § 981(a)(2)(A) such that all property would be forfeitable. *Id.* at 853–54. Instead, the Fifth Circuit held that proceeds from wire fraud fall under § 981(a)(2)(B). *See id.* The Fifth Circuit reasoned that the inquiry under § 981(a)(2) is to look at the underlying criminal conduct, not the crime itself. *Id.* at 854. When looking at wire fraud, running a business is a legal service performed in an illegal manner because the service could be performed legally if no fraud occurred. *Id.* (citing § 981(a)(2)). Thus, the operation of ETS in the card payment industry was a legal service performed in an illegal manner due to the alleged fraudulent conduct (Dkt. #274). *See id.* Likewise, the sale of ETS was legal but performed in an

illegal manner (i.e., sold at an inflated value due to the undisclosed fraud) (Dkt. #274). *See id.* Therefore, the definition of proceeds in § 981(a)(2)(B) applies and the illegal proceeds are those that relate to the inflated value of ETS, while the legal proceeds are those related to the actual fair market value of ETS without the fraudulent conduct. *See id.*

Additionally, the Fifth Circuit has noted that forfeiting the entire value of stock goes beyond the purpose of forfeiture as it forces the defendant to give up proceeds of the crime and also punishes the defendant by taking away his property. *See United States v. Gluk*, 831 F.3d 608, 618 n.11 (5th Cir. 2016) ("[The forfeiture statutes] exist to require defendants to give up the proceeds of their crimes, not to punish them for those crimes. . . . Requiring forfeiture of the entire value of stock sold would require forfeiting compensation, even when that compensation is not traceable to fraud."). Thus, the market value of Akkad's shares in ETS prior to any fraud is not traceable to the criminal activity. Accordingly, Akkad would be able to use the funds for his defense. *See id.*; *Luis*, 578 U.S. at 17. The same is true if Akkad can show the uninflated market value that he received for his portion ETS .

Yet, even if Akkad can show the legitimate value of ETS (whether it be through the pre-fraud value or the actual uninflated market value at the time of the sale), another problem exists. In the Fifth Circuit, untainted money in an account is used first. *United States v. Evans*, 892 F.3d 692 (2018). Out of the $33 million Akkad received for the sale of ETS, only $12.9 million still remains in the account (*See* Dkt. #415; Dkt. #421). Thus, Akkad spent approximately $20.1 million of the proceeds from the sale of ETS (*See* Dkt. #415; Dkt. #421). Therefore, Akkad must show not only the untainted amount of funds he received, but also that the current amount seized by the Government still contains untainted funds. In other words, Akkad must show that the value of the

13

untainted funds from the sale were approximately $22.1 million.[3] Just because Akkad can show that he received untainted funds from the sale of ETS does not mean that he has shown those are the funds that remain in the seized account. The Court is currently not in a position to determine whether any untainted funds remain in the seized amount because the Parties have not presented evidence regarding the amount of untainted funds Akkad received, nor the amount of those funds that remain in the account. [4]

In conclusion, Akkad has not provided the Court with the value of his stock before the implementation of the 0.3% Debit fee markup nor the uninflated market value of his stock when ETS sold. Further, he has not shown that the seized funds actually contain any clean money from the sale of ETS. Thus, the Court has no choice but to find that Akkad has not carried his burden to establish the amount of untainted funds that he can use for his defense. Accordingly, the Court finds it appropriate to deny Akkad's Motion without prejudice. If Akkad can bring forth evidence showing the value of his shares in ETS prior to when the alleged misconduct began or the uninflated value he received for the sale of ETS, he may be entitled to the release the remaining clean funds, if any.

---

[3] The Court notes that the Government has seized other property and placed *lis pendens* on Akkad's real property (Dkt. #415 at p. 9–10). Seeing as the Government has a protected interest in those assets, Akkad can use those values to decrease the $22.1 million amount. For example, the money spent on those other assets can be considered tainted, and the corresponding cash value in the account can be considered untainted for the purpose of determining if sufficient untainted funds remain in the account. Thus, if frozen real property has value of $1 million, Akkad only has to show that $21.1 million from the sale of ETS was untainted.

[4] The arguments before the Court have focused on whether any of the funds from the sale of ETS were tainted, but neither party addressed the valuation of ETS's untainted market value. The closest comparisons came from examining the amount of refunds the Bank paid to former ETS customers or the Government's argument at trial that approximately 25% of ETS's revenue was generated by fraud (*See* Dkt. #423; Dkt. #424; Dkt. #425–1). However, the refunds and money generated by fraud do not show the *value* of ETS. Thus, the Court is unable to determine the value of ETS as an entity and the value of Akkad's untainted ownership.

## CONCLUSION

It is therefore **ORDERED** that Defendant Hadi Akkad's Emergency Motion for Release of Funds Needed to Pay Legal Fees and Expenses and Request for Expedited Decision (Dkt. #415) is hereby **DENIED** without prejudice. Defendant Akkad's Motion for Leave to File Response to Government "Surreply" to Emergency Motion for Release of Funds to Pay Legal Costs and Fees (Dkt. #425) is **GRANTED**.

**IT IS SO ORDERED.**
**SIGNED** this 9th day of May, 2025.

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE