# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 4:22-cr-162 |
| | § | Judge Mazzant |
| HADI AKKAD (2) | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Hadi Akkad's Motion to Release Funds Under the Court's Order (Dkt. #439). Having considered the Motion, the relevant pleadings, and the applicable law, the Court finds that the Motion should be **DENIED** without prejudice.

## BACKGROUND

The factual and procedural background of this case are set out in full in the Court's prior Memorandum Opinion and Order Denying Akkad's Emergency Motion for Release of Funds (Dkt. #434). Through it, the Court held that Defendant had not carried his burden to show an entitlement to any funds now frozen and subject to forfeiture for purposes of his defense (Dkt. #434). But the Court denied that request without prejudice (Dkt. #434 at p. 15). The Court issued that Order on Friday May 9, 2025 (Dkt. #434). That same day, Defendant filed the instant Motion to Release Funds Under the Court's Order (Dkt. #439). Through it, Defendant seeks the release of seized funds under the outline the Court provided in its prior Memorandum Opinion and Order (Dkt. #439 at pp. 1–5). The Government filed its Response on May 11, 2025 (Dkt. #440). The matter proceeded to retrial on May 12, 2025. The Court now takes up the Motion.

## LEGAL STANDARD

"[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). A defendant's right to a fair opportunity to secure counsel of their choosing is a fundamental one. *Powell v. Alabama*, 287 U.S. 45, 53 (1932). But that "fair opportunity" is not without limits. *Luis v. United States*, 578 U.S. 5, 11–12 (2016) (plurality opinion) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)). A defendant has no right to an attorney who is not a member of the bar or who has a conflict of interest due to a relationship with an opposing party. *Id.* Further, an indigent defendant is entitled to adequate representation but has no right to force the Government to pay for his preferred choice of counsel. *See Caplin & Drysdale*, 491 U.S. at 624.

Though a defendant may retain private counsel, they may not use any property they wish to pay for that counsel. *United States v. Monsanto*, 491 U.S. 600, 615 (1989). Indeed, 21 U.S.C. § 853 authorizes a court to freeze an indicted defendant's assets prior to trial if those assets would be subject to forfeiture upon conviction. *Kaley v. United States*, 571 U.S. 320, 322 (2014). To freeze an indicted defendant's assets pretrial, the Court must find that there is "probable cause to believe that the property will ultimately be proved forfeitable." *Monsanto*, 491 U.S. at 615. That standard applies even when a defendant seeks to use the disputed property to pay for a lawyer. *Kaley*, 571 U.S. at 322. The Government has a strong interest in obtaining a full recovery of all forfeitable assets. *Id.* at 323 (citing *Caplin & Drysdale*, 491 U.S. at 631). To ensure a defendant does not spend allegedly ill-gotten funds pretrial, and thereby deprive the Government of a full recovery, the Government must have probable cause that two things are true: (1) that the defendant committed

an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to the crime charged. *Id.* (citing 21 U.S.C. § 853(a)).

When determining whether a pretrial freeze of a defendant's assets is proper, the Court and parties alike must distinguish between tainted and untainted funds. *See Luis*, 578 U.S. at 10. The pretrial freeze of tainted funds (i.e., those traceable to the crime) is constitutionally permissible, even if it prohibits the defendant from paying for his counsel of choice. *Monsanto*, 491 U.S. at 614–16. However, the pretrial freeze of untainted funds (i.e., those with no relation to the crime) violates a defendant's Sixth Amendment right to counsel. *Luis*, 578 U.S. at 22–23. To determine whether funds are tainted, the Court simply asks whether the defendant owns the property "pure and simple." *Id.* at 12. For example, a robber's loot belongs to the victim, not the defendant. *Id.* at 13 (citing *Telegraph Co. v. Davenport*, 97 U.S. 369, 372 (1878)). Similarly, a defendant does not own cocaine; because it is contraband and forfeitable wherever found. *Id.* (citing 21 U.S.C. § 881(a)). Likewise, title to property used to commit a crime (or otherwise "traceable" to a crime) often passes to the Government at the instant the crime is planned or committed. *Id.* (citing 21 U.S.C. § 853(c)). In contrast, a defendant retains ownership of any cash they owned prior to planning or committing a crime, free and clear of any interest by the Government or a victim. *See id.* at 17.

In analyzing whether particular property is forfeitable, the Court turns to 18 U.S.C. § 981, which authorizes the pretrial restraint and forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation" of conspiracy to commit wire fraud. 18 U.S.C. § 981(a)(1)(C). The statute defines proceeds in two different ways, one of which will apply depending on the nature of the criminal offense:

3

> (A) In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.
>
> (B) In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. The claimant shall have the burden of proof with respect to the issue of direct costs. The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.

18 U.S.C. § 981(a)(2)(A)–(B). In the Fifth Circuit, subsection (A) applies to those services which could never be performed legally (e.g., sale of food stamps, robbery, embezzlement). *United States v. Davis*, 53 F.4th 833, 853 (5th Cir. 2022). In contrast, subsection (B) applies when the services in the case were performed illegally but hypothetically could be performed legally. *Id.* (citing *United States v. Nacchio*, 573 F.3d 1062, 1089 (10th Cir. 2009)) ("[The] crime therefore involved a 'service that could, hypothetically, be provided in a lawful manner' (HVAC training) but that was provided in an 'illegal manner' (by fraudulently obtaining GI-Bill funds to pay students' tuition)").

## ANALYSIS

The Court has already addressed many of the arguments Defendant makes today in its prior Memorandum Opinion and Order (Dkt. #434). In that Order, though the Court held that Defendant did not carry his burden, the Court explained that Defendant must satisfy a dual-pronged test before the Court will release a portion of the seized funds to pay his attorneys (*See* Dkt. #434 at pp. 10–14). First, Defendant must show what property he owned free and clear of the alleged criminal behavior (i.e., untainted property) (Dkt. #434 at pp. 10–13). *See Luis*, 578 U.S. at 12. If Defendant can show that he owned a portion of untainted funds from the sale of ETS,

4

then he must show that a portion of the remaining $12.9 million seized by the Government contained untainted funds (Dkt. #434 at pp. 13–14) (citing *United States v. Evans*, 892 F.3d 692, 708–10 (5thCir. 2018)). In its prior Order, the Court cautioned that the parties should not rely on refunds issued by the Bank, nor the use of the alleged amount of revenue produced by fraud to determine the uninflated market value of ETS (Dkt. #434 at p. 14 n.4).

In response to the Court's Order, Defendant filed the instant Motion seeking the release of a portion of the seized funds (Dkt. #439). Through it, Defendant argues that he is entitled to the release of funds for a variety of reasons (Dkt. #439). First, he focuses on how the Bank paid 7.5 times the revenue ETS generated for the sale of the company (Dkt. #439 at p. 1). Thus, according to Defendant, his 20% ownership interest in the company would be worth approximately $9 million in pre-fraud value (Dkt. #439 at pp. 1–4). Second, he returns to his original argument that ETS's inflated value is 25% of the sale price (Dkt. #439 at pp. 1–4). Thus, he claims that he only received approximately $8.25 million in tainted funds, leaving over $4 million in untainted funds out of the $12.9 million seized (*See* Dkt. #423; Dkt. #424; Dkt. #425-1; Dkt. #439). Finally, Defendant argues that the pre-fraud value should be subtracted from the full $33 million, leaving $24 million in value for the time during the fraud, of which 75% is untainted (or approximately $6.5 million) (Dkt. #439 at p. 4).

The Government maintains that Defendant's renewed Motion still does not satisfy his burden under *Luis* (Dkt. #440). Specifically, the Government argues that Defendant has still not shown either the actual value of any untainted funds or that any untainted funds remain in the account (Dkt. #440). In furtherance of that position, the Government quotes the Court's prior Order stating that "the refunds and money generated by fraud do not show the value of ETS."

5

(Dkt #440 at p. 2) (citing Dkt. #434 at p. 14 n.4). The Government argues that Defendant's renewed Motion presents a valuation based only on the refunds and money generated by fraud (Dkt. #440 at p. 2). As to tracing, the Government assumes for the sake of argument that Defendant owned $9 million in untainted money based on the pre-fraud value of his shares in ETS (Dkt. #440 at p. 3). However, even operating under that assumption, the Government argues that Defendant makes no effort to show that any of the $9 million remains in the account, nor that any of the remaining $12.9 million contains any untainted funds (Dkt. #440 at pp. 3–4).

The Court agrees with the Government. While Defendant has shown that he received some untainted funds from the sale of ETS (based on the pre-fraud value of his ETS shares), he has not carried his burden to show that any of those funds remain in the seized account. At the outset, the Court will clarify that Defendant must meet two elements. First, he must show that he received funds from the sale of ETS that reflect his untainted ownership in ETS (Dkt. #434 at pp. 10–13). *See Luis*, 578 U.S. at 12. If Defendant succeeds in showing the value of the untainted funds, he next must show that some of those funds remain in the seized $12.9 million account (Dkt. #434 at pp. 13–14). *See Evans*, 892 F.3d at 708–10. Defendant has not carried his burden for either prong, as discussed below.

I.   **Valuation of ETS**

Fair market value, while a universally recognized standard, is often elusive to determine. *Dunn v. C.I.R.*, 301 F.3d 339, 350 (5th Cir. 2002).[1] Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, [with] neither being

---

[1] *Dunn* contemplates an Estate's appeal of a Tax Court decision. 301 F.3d at 342. The parties have not provided the Court with any Fifth Circuit decision explaining how to value a company in the forfeiture context. But the Court finds the valuation considerations noted in tax cases persuasive for purposes of valuing a company in the criminal forfeiture context.

6

under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973). It is undoubtedly more difficult to value a closely held company that is not regularly traded on an exchange. *See Dunn*, 301 F.3d at 350. However, the Court must consider several factors to value closely held companies: (1) comparison to other companies engaged in the same or similar businesses which recently sold stock; (2) the assets of the company; (3) net worth; (4) prospective earning power; (5) dividend-paying capacity; (6) good will; (7) position in the industry; (8) management; (9) and the industry's economic outlook. *Id.*

    Defendant's valuation metric relies exclusively on the Government's argument at the first trial that approximately 25% of ETS's revenue was derived from the fraudulent scheme (*See* Dkt. #439). He argues that if 25% of ETS's revenue was tainted, then, at most, 25% of ETS's fair market value would be tainted (*See* Dkt. #429). However, such a valuation merely echoes Defendant's prior arguments and ignores the Court's Opinion that valuing ETS would take more than focusing on the revenue ETS generated, or the refunds paid by the Bank (*See* Dkt. #423; Dkt. #424; Dkt. #425-1; Dkt. #434; Dkt. #439). In short, Defendant was required to bring forward more evidence than just citing to the refunds paid by the Bank or the Government's argument that 25% of ETS's revenue was obtained through the alleged scheme. As the Court stated previously, "the refunds and money generated by fraud do not show the *value* of ETS. Thus, the Court is unable to determine the value of ETS as an entity and the value of Akkad's untainted ownership." (Dkt. #434 at p. 14 n.4). Revenue is undoubtedly an important consideration when valuing a company. *See Dunn*, 301 F.3d at 350. However, it is not the only consideration. *See id.* ETS had a number of assets that would contribute to its valuation: trademarks, untainted accounts receivable, untainted

7

working capital, real property and/or leases, domain names, social media accounts, other intellectual property, licenses, and/or permits (Dkt. #423-1 at pp. 83–84). Likewise, Defendant could point to similarly situated companies to determine the fair market value of ETS. *See id.* Yet, he has not done so. Defendant's new Motion adds nothing to the arguments he has already raised. He points to no new evidence and advances no new argument that would enable the Court to value ETS with any degree of relative accuracy.

The Court is sympathetic to the difficulties in proving the untainted value of ETS. That endeavor requires evidence of the untainted fair market value of Defendant's shares, comparisons to the market value of other similarly situated companies, and potentially expert assistance. Demanding as Defendant may find it here, that burden is what the law demands he carry before the Court will release any funds subject to the seizure Order. On the other hand, at this juncture, the Government need only establish probable cause that the seized funds in the account reflect the forfeitable inflated value of ETS. *See Monsanto*, 491 U.S. at 615. While the same valuation problems may arise when the Government attempts to show by a preponderance of the evidence that the full amount of seized funds is, in fact, forfeitable, it need not provide the same level of evidence at this stage. *Compare Monsanto*, 491 U.S. at 615 (holding probable cause is needed to restrain funds pretrial), *with United States v. Gasanova*, 332 F.3d 297, 300–01 (5th Cir. 2003) (holding that the burden of proof for forfeiture is preponderance of the evidence). Instead, due to the unique nature of the seized funds in this case, Defendant has the burden to establish that he actually owns untainted funds he seeks to use for his defense. *See Luis*, 578 U.S. at 12. He has not done so.

## II.  Remaining Untainted Funds

Even assuming that Defendant proved the amount of untainted funds he received from the sale of ETS, he has not shown that any of those funds remain in the account. His Motion does not

discuss, in any meaningful way, whether untainted funds actually remain in the account (*See* Dkt. #439). Second, even assuming some remain, his valuation of ETS does not allow the Court to determine what amount remains (*See* Dkt. #439). All the Government had to show is that probable cause exists to restrain the funds before trial. *Monsanto*, 491 U.S. at 615. The Government did so (Dkt. #434 at pp. 9–10).

> In the Court's prior Order, it stated that:
>
>> Yet, even if Akkad can show the legitimate value of ETS (whether it be through the pre-fraud value or the actual uninflated market value at the time of the sale), another problem exists. In the Fifth Circuit, untainted money in an account is used first. *United States v. Evans*, 892 F.3d 692 (2018). Out of the $33 million Akkad received for the sale of ETS, only $12.9 million still remains in the account (*See* Dkt. #415; Dkt. #421). Thus, Akkad spent approximately $20.1 million of the proceeds from the sale of ETS (*See* Dkt. #415; Dkt. #421). Therefore, Akkad must show not only the untainted amount of funds he received, but also that the current amount seized by the Government still contains untainted funds. In other words, Akkad must show that the value of the untainted funds from the sale were approximately $22.1 million. Just because Akkad can show that he received untainted funds from the sale of ETS does not mean that he has shown those are the funds that remain in the seized account. The Court is currently not in a position to determine whether any untainted funds remain in the seized amount because the Parties have not presented evidence regarding the amount of untainted funds Akkad received, nor the amount of those funds that remain in the account.

(Dkt. #434 at pp. 13–14). Despite stating that Defendant needs to show untainted funds remain in the seized account, he has not provided any argument or evidence that they do (*See* Dkt. #439). Defendant's arguments that untainted funds remain in the account all stem from his argument that only 25% of the funds ETS received were fraudulent. The Court has already addressed the problems with that valuation. *See supra* Section I.

Defendant must show untainted funds remain in the seized account because he has spent over $20 million he received from the sale of ETS (Dkt. #434 at pp. 13–14). If all of the $33 million remained in the account, the analysis would be much different. However, with over 60% of the sale funds used, Defendant must bring forward evidence to show he owns the restrained funds, free and clear of any criminal conduct. *See Luis*, 578 U.S. at 12. He has not done so.[2]

In short, Defendant has not succeeded in satisfying either prong with enough evidence to permit the Court to release seized funds to pay his defense. Even if Defendant is convicted, the Government has yet to show that all of the funds will actually be forfeited, as it has only met its burden to show probable cause that the funds are forfeitable. Should the Government fail to meet its higher burden at the forfeiture stage, Defendant can use whatever funds are not subject to forfeiture to pay his attorneys. Likewise, if Defendant can show that untainted funds remain in the account, in addition to the untainted funds he received, he will be entitled to the release of those funds. Because he has not met his burden, the Court must deny his Motion.

## CONCLUSION

It is therefore **ORDERED** that Defendant Hadi Akkad's Motion to Release Funds Under the Court's Order (Dkt. #439) is hereby **DENIED** without prejudice.

**IT IS SO ORDERED.**
**SIGNED** this 16th day of May, 2025.

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

---

[2] If Defendant is ultimately convicted of the underlying offense, the Government will have to prove by a preponderance of the evidence, the amount of tainted funds that remain in his account, in addition to what other property is subject to forfeiture. *See Gasanova*, 332 F.3d at 300–01.