# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | Case No.4:22-cr-162 |
| § | Judge Mazzant |
| HADI AKKAD (2) § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Hadi Akkad's Emergency Motion for Release of Funds (Dkt. #499). Having considered the Motion, the relevant pleadings, and the applicable law, the Court finds that the Motion should be **DENIED**. The Court also finds that Defendant's Motion to Withdraw (Dkt. #499) should be **DENIED**. The Court finds that Defendant's alternative request for the appointment of CJA counsel should be **GRANTED** and the Court will **APPOINT** David Gerger as CJA counsel starting from the date of this Order. Also before the Court is Akkad's Motion for Telephone Hearing (Dkt. #522). Having considered the Motion, the relevant pleadings, and the applicable law, the Court finds that the Motion should be **DENIED**.

## BACKGROUND

This is Defendant's third motion requesting the release of seized funds to pay for counsel, which comes after two mistrials.[1] The Court denied Defendant's prior Motions because Defendant did not carry his burden to show that any of the seized funds are untainted (Dkt. #434; Dkt. #448). In this third attempt, Defendant tries again, this time with an expert opinion (Dkt. #499;

---

[1] The factual and procedural background is more fully set out in the Court's prior Memorandum Opinions and Orders (*See* Dkt. #434; Dkt. #448).

Dkt. #499-24). But, even with this expert, Defendant has not carried his burden. His Motion should be denied a third time, as explained below.

On June 23, 2025, Defendant again filed his Emergency Motion for Release of Funds (Dkt. #499). Through it, he seeks to obtain funds that the Government seized to pay for counsel to represent him in the coming third trial and for living expenses (Dkt. #499). Should the Court deny his Motion to Release Funds, his counsel seeks permission to withdraw and requests that the Court appoint CJA counsel (Dkt. #499). The Government responded on July 7, 2025 (Dkt. #504). On July 9, 2025, Defendant filed his Reply, and the Government filed its Sur-Reply (Dkt. #505; Dkt. #506). Defendant filed a Motion for Telephone Hearing and Request for Expedited Ruling on his Motion for the release of funds on July 31, 2025 (Dkt. #522). The Government filed its Response in opposition to the Motion for a hearing on August 14, 2025 (Dkt. #523).

## LEGAL STANDARD

"[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). A Defendant has a fundamental right to a "fair opportunity" to obtain his choice of counsel. *Powell v. Alabama*, 287 U.S. 45, 53 (1932). But that "fair opportunity" is not without limits. *Luis v. United States*, 578 U.S. 5, 11–12 (2016) (plurality opinion) (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)). A defendant has no right to an attorney who is not a member of the bar or who has a conflict of interest due to a relationship with an opposing party. *Id.* Further, while an indigent defendant is entitled to adequate representation, he does not have the right to force the Government to pay for his preferred counsel. *See Caplin & Drysdale*, 491 U.S. at 624.

Further, though a defendant may retain private counsel, they may not use any property they wish to pay for that counsel. *United States v. Monsanto*, 491 U.S. 600, 615 (1989). Indeed, 21 U.S.C. § 853 authorizes a court to freeze an indicted defendant's assets prior to trial if those assets would be subject to forfeiture upon conviction. *Kaley v. United States*, 571 U.S. 320, 322 (2014). To freeze an indicted defendant's assets pretrial, the Court must find that there is "probable cause to believe that the property will ultimately be proved forfeitable." *Monsanto*, 491 U.S. at 615. That standard applies even when a defendant seeks to use the disputed property to pay for a lawyer. *Kaley*, 571 U.S. at 322. The Government has a strong interest in obtaining a full recovery of all forfeitable assets. *Id.* at 323 (citing *Caplin & Drysdale*, 491 U.S. at 631). To ensure a defendant does not spend allegedly ill-gotten funds pretrial, and thereby deprive the Government of a full recovery, the Government must have probable cause that two things are true: (1) that the defendant committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to the crime charged. *Id.* (citing 21 U.S.C. § 853(a)).

When determining whether a pretrial freeze of a defendant's assets is proper, the Court and parties alike must distinguish between tainted and untainted funds. *See Luis*, 578 U.S. at 10. The pretrial freeze of tainted funds (i.e., those traceable to the crime) is constitutionally permissible, even if it prohibits the defendant from paying for his counsel of choice. *Monsanto*, 491 U.S. at 614–16. However, the pretrial freeze of untainted funds (i.e., those with no relation to the crime) violates a defendant's Sixth Amendment right to counsel. *Luis*, 578 U.S. at 22–23. To determine whether funds are tainted, the Court simply asks whether the defendant owns the property "pure and simple." *Id.* at 12. For example, a robber's loot belongs to the victim, not the defendant. *Id.* at 13 (citing *Telegraph Co. v. Davenport*, 97 U.S. 369, 372 (1878)). Similarly, a

3

defendant does not own cocaine; because it is contraband and forfeitable wherever found. *Id.* (citing 21 U.S.C. § 881(a)). Likewise, title to property used to commit a crime (or otherwise "traceable" to a crime) often passes to the Government at the instant the crime is planned or committed. *Id.* (citing 21 U.S.C. § 853(c)). In contrast, a defendant retains ownership of any cash they owned prior to planning or committing a crime, free and clear of any interest by the Government or a victim. *See id.* at 17.

In analyzing whether particular property is forfeitable, the Court turns to 18 U.S.C. § 981, which authorizes the pretrial restraint and forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation" of conspiracy to commit wire fraud. 18 U.S.C. § 981(a)(1)(C). The statute defines proceeds in two different ways, one of which will apply depending on the nature of the criminal offense:

> (A) In cases involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term "proceeds" means property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense.
>
> (B) In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term "proceeds" means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services. The claimant shall have the burden of proof with respect to the issue of direct costs. The direct costs shall not include any part of the overhead expenses of the entity providing the goods or services, or any part of the income taxes paid by the entity.

18 U.S.C. § 981(a)(2)(A)–(B). In the Fifth Circuit, subsection (A) applies to those services which could never be performed legally (e.g., sale of food stamps, robbery, embezzlement). *United States v. Davis*, 53 F.4th 833, 853 (5th Cir. 2022). In contrast, subsection (B) applies when the services in the case were performed illegally but hypothetically could be performed legally. *Id.* (citing *United*

4

*States v. Nacchio*, 573 F.3d 1062, 1089 (10th Cir. 2009)) ("[The] crime therefore involved a 'service that could, hypothetically, be provided in a lawful manner' (HVAC training) but that was provided in an 'illegal manner' (by fraudulently obtaining GI-Bill funds to pay students' tuition)").

## ANALYSIS

The Court has addressed this issue twice already in the life of this case (Dkt. #434; Dkt. #448). In its previous Memorandum Opinions and Orders, the Court held that Defendant had not carried his burden to satisfy a dual-pronged test for the Court to release a portion of the seized funds. That is, he did not show what untainted property he owned. And second, he did not show that some portion of the remaining $12.9 million contains untainted funds (*See* Dkt. #434 at pp. 10–14; Dkt. #448 at pp. 6–10). *See Luis*, 578 U.S. at 12; *United States v. Evans*, 892 F.3d 692, 708–10 (5th Cir. 2018). Defendant now attempts, for the third time, to show that he owns untainted funds (*See* Dkt. #499).

In his third attempt to satisfy both elements, Defendant presented the Court with multiple trial exhibits and the report of Edward Slominski, an alleged expert in the field of payment processing (Dkt. #499; Dkt. #499-24). Based on this evidence, Defendant offers three arguments in support of releasing the seized funds (*See* Dkt. #499). First, he argues that the Government did not have probable cause to seize the bank account (Dkt. #499 at pp. 5–8). Next, relying on Slominski's Report, he argues that the funds should be released because the sale price of ETS was not inflated (Dkt. #499 at pp. 8–10). Finally, again relying on Slominski's Report, he argues that, at most, the sale price of ETS was inflated by 25% (Dkt. #499 at pp. 10–12).

The Government argues that Defendant has not carried his burden for the same reasons as before (*See* Dkt. #504) (citing Dkt. #434; Dkt. #448). The Government argues that the Court has

5

repeatedly found that probable cause exists for the seizure (Dkt. #504 at pp. 2–3). Next, it submits that Defendant's valuation method remains flawed as he still relies on ETS's revenue to reach its conclusion (Dkt. #504 at pp. 3–7). As a part of this argument, the Government provides the following objections to Slominski's Report on the following grounds: (1) it does not offer any new evidence; (2) it does not provide any market comparisons outside of Slominski's own company; (3) it does not account for evidence of the problems and fraud at ETS; (4) it speculates about U.S. Bank's business intentions during the sale of ETS; and (5) it does not offer insight into the pre-2012 value of ETS (Dkt. #504 at pp. 4–5). Finally, the Government argues that, even if Defendant provided a valuation of ETS, he has not shown the amount of untainted funds that remain in the account (Dkt. #504 at pp. 5–6).

Defendant's Reply argues that he has carried his burden and has established his ownership of untainted funds through the evidence he now submits (Dkt. #505). Further, he faults the Government for not providing any substantive argument regarding how much of ETS's sale price was inflated (Dkt. #505 at pp. 1–3). Additionally, he notes that Slominski's Report is uncontroverted as the Government did not offer its own expert to opine on the proper valuation of ETS (Dkt. #505 at p. 2). The Government's Sur-Reply focuses on how Defendant has not presented any argument or evidence showing the pre-fraud value of his stock in ETS (Dkt. #506). Thus, according to the Government, Defendant has not carried his burden yet again (Dkt. #506).

Ultimately, the third time is not the charm. The only new evidence Defendant presents is Slominski's Expert Report. Despite his use of an expert, Defendant has still not shown what amount of funds have no connection to the alleged crime. Before explaining why, the Court must make one point clear: the Government has established probable cause to seize the funds. Defendant

6

was indicted by three Grand Juries (Dkt. #1; Dkt. #274; Dkt. #516).[2] The Court has held two trials related to Defendant's actions. And the Court has denied Defendant's Rule 29 Motions (Dkt. #388; Dkt. #451 at p. 3). The $12.9 million the Government seized is inherently connected to the alleged fraudulent scheme, as those funds were produced from the sale of ETS at an alleged inflated value (*See* Dkt. #274). During the first trial, the CEO of U.S. Bank stated that he would not have completed the sale had he known how ETS conducted its allegedly fraudulent billing practices (Dkt. #378 at p. 20). Further, out of the $33 million that Defendant received from the sale, Defendant spent *over $20 million* prior to the Government's seizure. Thus, Defendant can only receive the release of any funds if he shows that they are unconnected to any alleged inflation in the price of ETS (Dkt. #434; Dkt. #448). *See Luis*, 578 U.S. at 22–23. He has not done so.

The Court begins its substantive analysis by addressing the shortcomings of Slominski's Expert Report. Slominski reaches two conclusions: (1) that the sale price of ETS was not inflated and reflected the company's fair market value, and (2) even if the sale price was inflated, it would not have been inflated by more than 25% (Dkt. #499-24). To reach these conclusions, Slominski states that the fair market value of a payment processing company is calculated by taking the residual revenue of the company and multiplying it by an agreed on multiplier (Dkt. #499-24 at pp. 5–6). The multiplier applied to ETS would have accounted for two main factors: (1) ETS's clients, and (2) ETS's proprietary technology (Dkt. #499-24 at pp. 5–6). In the sale to U.S. Bank, the multiplier was set at 7.5 times the residual revenue (Dkt. #499-24 at p. 6). Slominski states that such a multiplier is accurate and reflects the fair market value for ETS, which he supports by

---

[2] The Court notes that the third indictment in this case (the "Second Superseding Indictment") was filed after the conclusion of the second trial (Dkt. #516).

7

claiming that his own, less valuable, payment processing company sold in 2009 with a multiplier of 5.3 times the residual revenue (Dkt. #499-24 at pp. 2–3).

Slominski's Report does not touch on the factors that the Court pointed out in its second Memorandum Opinion and Order denying his request for the release of funds (*Compare* Dkt. #448, *with* Dkt. #499-24). There, the Court listed the following factors that should be considered in addition to revenue when determining the uninflated value of a company: (1) comparison to other companies engaged in the same or similar businesses which recently sold stock; (2) the assets of the company; (3) net worth; (4) prospective earning power; (5) dividend-paying capacity; (6) good will; (7) position in the industry; (8) management; (9) and the industry's economic outlook (Dkt. #448 at p. 7) (citing *Dunn v. C.I.R.*, 301 F.3d 339, 350 (5th Cir. 2002)). At best, Slominski only discussed the first, second, fourth, and seventh factors (*See* Dkt. #499-24).

Slominski touches on market comparisons through an off-hand discussion of the multiplier used to value the payment processing company he owned and sold ten years before ETS was sold (Dkt. #499-24 at pp. 2–3). However, he does not discuss any of the factors that were accounted for when determining the multiplier for his company (*See* Dkt. #499-24). Instead, he merely states that ETS is a more valuable company based on two factors (*See* Dkt. #499-24 at pp. 2–3). The Court finds that this discussion is lacking. Slominski does not provide a meaningful discussion of the similarities and differences between ETS and his company (*See* Dkt. #499-24). Nor does Slominski address the relevant market conditions that would support a higher multiplier for ETS when it sold ten years later (*See* Dkt. #499-24).

Another problem with Slominski's evaluation is that it does not discuss how the uninflated residual revenue would impact the fair market value (*See* Dkt. #499-24). Assuming that

8

Slominski's method for determining the fair market value of a payment processing company is accurate, he does not account for the fact that, at a minimum, the Government has established probable cause to believe that at least 25% of ETS's residual revenue was the product of the allegedly fraudulent scheme (*See, e.g.*, Dkt. #471 at p. 42; Gov't Tr. Ex. #233). Instead, he makes a conclusory determination that 25% overstates the inflated value of the proceeds of the alleged fraudulent scheme (*See* Dkt. #499-24 at pp. 6–8). Yet, in a calculation that relies on residual revenue as part of the determination of fair market value, Slominski does not opine on how a reduced revenue would impact the fair market value of ETS (*See* Dkt. #499-24). Nor does he address how the multiplier would be affected by a 25% reduction in ETS's residual revenue (*See* Dkt. #499-24). In short, the Court finds that Slominski does not follow his own methodology when accounting for the funds that were the product of the alleged fraudulent scheme. Since the Report does not account for the impact of these funds, the Court is still left to wonder: how much of the remaining money does Defendant own free and clear from any connection to the alleged fraud?

As the Court stated previously, the clearest way to answer this question is to examine the pre-fraud value of Defendant's ownership in ETS (Dkt. #434 at pp. 11–12). Defendant's Motion and Slominski's Report do not discuss this value (*See* Dkt. #499; Dkt. #499-24). As the Government points out, this is likely because Defendant has already spent those funds (*See* Dkt. #504 at pp. 5–7; Dkt. #506). This illustrates the Court's point. Defendant spent over $20 million before his account was seized. Now, the remaining funds are those closely connected ETS's alleged inflated value. While there may be some untainted funds that remain, Defendant has not presented sufficient evidence for the Court to determine the fair market value of ETS to any relative degree of accuracy. Defendant is not entitled to the release of any funds if they are

connected to the alleged fraudulent scheme. *See Luis*, 578 U.S. at 12–13, 17; *Monsanto*, 491 U.S. at 614–16. For the third time, Defendant has not shown the value of what he owned, thus the Court finds it must deny his Motion.

Having determined that Defendant has not carried his burden, the Court must now address his counsel's request to withdraw. In his Motion, defense counsel seeks to withdraw should the Court deny his Motion for the Release of Funds (Dkt. #499 at p. 14). However, in his Motion for Telephone Hearing and Request for Expedited Ruling, Defendant states that he plans to appeal if the Court denies his request for the release of funds (Dkt. #522). The Court finds that it should deny the Motion for defense counsel to withdraw. The court also finds that it should grant Defendant's request for the appointment of CJA counsel and will appoint David Gerger as CJA counsel starting from the date of this Order.

## CONCLUSION

It is therefore **ORDERED** that Defendant Hadi Akkad's Emergency Motion for Release of Funds (Dkt. #499) is hereby **DENIED**. The Court **DENIES** Defendant Hadi Akkad's Motion to Withdraw (Dkt. #499). Defendant's alternative request for the appointment of CJA counsel is **GRANTED** and the Court **APPOINTS** David Gerger as CJA counsel starting from the date of this Order. It is further Ordered that Akkad's Motion for Telephone Hearing (Dkt. #522) is **DENIED**.

IT IS SO ORDERED.

SIGNED this 27th day of August, 2025.

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE